IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

————

**SHERYL PALONI,**

       **Plaintiff,**

**v.**                                                          **No. CIV 03-513 BB/ACT**

**CITY OF ALBUQUERQUE POLICE DEPARTMENT,**

       **Defendant.**

## MEMORANDUM OPINION

THIS MATTER comes before the Court for consideration of motions for reconsideration filed by both Defendant (Doc. 147) and Plaintiff (Doc. 158), as well as two motions filed by Defendant asking to strike the same exhibit (Docs. 135, 136). The Court has reviewed the submissions of the parties and the relevant law. For the reasons set forth below, the Court will deny the motions to strike the exhibit, deny Plaintiff's motion for reconsideration, and grant Defendant's motion for reconsideration.

**Motions to Strike:** Defendants filed two separate motions to strike directed at the same exhibit. This exhibit is a note, written on a piece of paper which contains pre-printed notations as follows: at the bottom of the page, "Albuquerque Police Department"; at the top of the page, "From the Desk of: Captain Sonny Leeper". Hand-written on the paper is the date, February 12, 2002, and the note states, in paraphrased form, "Ray: Paloni and Mashburn could be suspended. Spoke to Paloni at the Academy." Despite the fact that the note was provided to defense counsel by Captain Leeper, and clearly appears to have been written by him, and clearly refers to Plaintiff, Defendant inexplicably argues the note should be stricken as evidence because it is "unsworn" and "uncertified." As defense counsel should be aware, "[a]t the summary judgment stage, [plaintiff] need not produce

evidence in a form that would be admissible at trial, but the content or the substance of the evidence must be admissible." *Hardy v. S.F. Phosphates Limited Co.*, 185 F.3d 1076, 1082 n. 5 (10th Cir.1999). The contents of a note written on a supervisor's letterhead, concerning possible disciplinary action against a plaintiff, are certainly relevant to the plaintiff's lawsuit challenging such discipline. Those contents are also potentially admissible as admissions by a party-opponent. The motions to strike will be denied.

**Plaintiff's Motion for Reconsideration Or to Strike:** The Court will first address a procedural objection raised by Defendant that is completely without merit. Defendant argues at length that this motion by Plaintiff is a motion filed under either Rule 60 or Rule 59 of the federal rules of civil procedure. Proceeding from that premise, Defendant maintains the motion meets none of the timeliness requirements or other requirements of those rules, and should be denied on that basis. However, these rules apply to final judgments issued by a court, not to interlocutory decisions made by the court prior to the entry of any judgment. *See, e.g., Raytheon Constructors Inc. v. ASARCO Inc.*, 368 F.3d 1214, 1216-17 (10th Cir. 2003) (district court erred in treating motion for reconsideration as Rule 60(b) motion, where no final order or judgment had yet been entered); *Wagoner v. Wagoner*, 938 F.2d 1120, 1122 n. 1 (10th Cir. 1991) (motion to reconsider decision made before entry of final judgment does not implicate requirements of Rule 59). All of Defendant's arguments concerning those rules, therefore, are irrelevant to this motion.

Plaintiff contends Defendant's motion for reconsideration should be stricken as a sanction for the late disclosure of the note discussed in the preceding section. The note was discovered by Captain Leeper after the close of discovery, and turned over to counsel for Plaintiff. Plaintiff contends the note is highly significant because it indicates there was discussion between Captain Leeper and Deputy Chief Ray Schultz concerning a plan to impose the serious sanction of suspension

on Plaintiff and her co-employee, Mashburn, and that the discussion took place before the investigation by Internal Affairs had even begun.

The Court notes that Plaintiff has been granted an opportunity to depose Captain Leeper concerning the contents of the note, by order of the Magistrate Judge presiding over discovery matters in this case. [Doc. 168] Plaintiff has taken advantage of this opportunity, but has not submitted any additional evidence to the Court concerning the note or any preliminary discussions concerning the discipline Plaintiff and Mashburn might face.[1] Based on the information currently before the Court, the only reasonable explanation for the note is that it corroborates deposition testimony given by both Plaintiff and Captain Leeper. Plaintiff testified that she had a conversation with Leeper in which Leeper told her the deputy chief and chief wanted to suspend her, while he fought against such an action. [MSJ memo, Exh. A, Plaintiff dep. pp. 208-10] Leeper testified there were rumors concerning a possible suspension, he discussed those rumors with Deputy Chief Schultz, and Schultz discounted the rumors. [Reply to Resp. to Mot. to Strike, Exh. B, Leeper dep. pp. 83-84] The note confirms that Leeper spoke to both "Ray" (presumably, Ray Schultz) and Plaintiff concerning possible suspension, long before any action was actually taken against Plaintiff. Since Plaintiff has had an opportunity to depose Leeper about the note, and the note merely corroborates

---

[1] While this opinion was being prepared, Plaintiff submitted a "notice" (Doc. 171) requesting oral argument or briefing due to "Defendant's counsel's failure to make proper discovery..." Plaintiff complains that the deposition of Captain Leeper was not completed due to repeated instructions from defense counsel to Leeper, preventing Leeper from answering a number of questions. Plaintiff also complains that the deposition shows defense counsel did not ask Leeper to search for documents related to this case until after discovery had closed. These are matters that should have been timely raised with the Magistrate Judge who issued the order allowing Plaintiff to depose Captain Leeper. According to that order, the deposition was to be completed by January 7, 30 days from the date of the order. If there were problems with compliance with the rules of discovery, it was incumbent on Plaintiff to notify the Magistrate of those problems in a timely manner, not three months after the deadline established by the discovery order. The Court will not allow Plaintiff to bypass the Magistrate and assert untimely objections to Defendant's compliance with the Magistrate's discovery order or other discovery obligations. Defendant's motion to strike Plaintiff's "notice" (Doc. 172) is therefore moot.

other evidence in the record, the Court will deny Plaintiff's request to strike Defendant's motion for summary judgment as a sanction for the late disclosure of the note.

As to the merits of the motion for reconsideration, most of Plaintiff's arguments reiterate points the Court has already rejected. Plaintiff continues to argue that requiring her to attend retraining concerning the use of force was extremely damaging to her confidence, making her doubt her ability to know when she should use such force and thereby causing her to risk her life if she had remained a police officer.[2] As the Court has discussed at length in the prior opinion in this case, the existence of an adverse employment action, for Title VII purposes, is measured by an objective standard rather than by the employee's subjective reaction to the discipline imposed. This is true even if the employee's reaction to the discipline is extreme. *See Mangano v. Sheahan*, 2002 WL 1821738 (N.D. Ill. unpublished) (deputy sheriff's depression and resultant medical leave did not constitute adverse employment action; if action itself is not adverse employment action, plaintiff's reaction cannot create an adverse employment action); *Swanson v. Allstate Ins. Co.*, 102 F.Supp.2d 949, 971 n. 16 (N.D. Ill. 2000) (major depression resulting from job-in-jeopardy notice could not be considered adverse employment action if notice itself was not; personal impact on employee is not an employment action); *see also Davis v. Town of Lake Park, Fla.,* 245 F.3d 1232, 1242 (11th Cir. 2001) (loss of prestige or self-esteem felt by employee who receives unwarranted job criticism or performance review will rarely establish adverse employment action under Title VII). Plaintiff's loss

---

[2]This assertion is contradicted somewhat by Plaintiff's statement in her deposition that she still does not believe she did anything wrong in firing her weapon. [MSJ, Exh. A, p. 93] Plaintiff's deposition does not indicate she lost any confidence in her abilities as an officer; she consistently stated, in effect, that the finding that she needed retraining was wrong. Furthermore, she did not try to arrange for any retraining, and explained it was the police department's duty, not hers, to arrange for such training. [*Id.*, p. 230] This does not sound like someone who was in doubt about her ability to know when to use deadly force; it sounds instead like someone who strongly feels she was unjustly accused of violating the department's standard operating procedure. For purposes of this motion, however, the Court will accept Plaintiff's assertion that she did lose confidence in her ability to know when to use deadly force.

4

of confidence in her abilities or knowledge, even if it was extreme and involved a crucial part of her job, does not raise the "retraining" requirement to the level of an adverse employment action.

Plaintiff has attempted to distinguish every case relied on by the Court in the previous opinion for the proposition that ordering an employee to undergo retraining, which can be accomplished in a few hours, with no loss of pay or benefits, cannot be considered an adverse employment action for Title VII purposes. The Court agrees that none of the cases is "on all fours." However, those cases involve the specific type of discipline imposed here, and illustrate the general rule relied on by the Court – the existence of an adverse employment action is measured by an objective standard, not a subjective standard, and actions by an employer that do not tangibly affect the employee's pay, benefits, or working conditions will rarely rise to the level of an adverse employment action. Plaintiff has apparently been unable to find a case contradicting those cited by the Court, in which a level of discipline as minor as this one has been found to constitute an adverse employment action.

Plaintiff argues that the discriminatory finding that she violated the standard operating procedure forced her to vocally protest the police department's actions in singling out women officers for discipline. This in turn, she contends, caused her to be viewed as a troublemaker by other officers (although, as discussed in the prior opinion, the male members of her own unit were "great"). According to Plaintiff, this could have caused the members of the "ROP" unit to be hesitant to back her up if she needed it, and could have put her life in danger. Plaintiff relies on *Apgar v. State of Wyoming*, 2000 WL 1059444 (10th Cir. unpublished), in which the Tenth Circuit found that a female state highway patrol officer had raised a genuine issue of material fact as to whether she was constructively discharged. The officer presented evidence that she was ostracized on a daily basis and, significantly, that male officers failed to provide backup when she was searching for escaped prisoners. In contrast, in this case Plaintiff has presented nothing but speculation and hearsay as to

whether any other officers were angry at her at all, let alone that they were so angry they would be willing to endanger her safety.

In addition, Plaintiff's contention that her reaction to the proposed discipline, coupled with the alleged animosity created by that reaction, should be considered in analyzing the adverse-employment-action issue, is problematic. Plaintiff has presented no evidence indicating that her supervisors were aware of any hostility or harassment that the ROP officers, or other officers, might have inflicted upon Plaintiff. Absent such evidence, Defendant cannot be held liable for the hostility or harassment. *See Gunnell v. Utah Valley State College*, 152 F.3d 1253, 1265 (10th Cir. 1998) (while co-worker hostility may qualify as an adverse employment action under certain circumstances, this is only true if supervisory or management personnel either orchestrate the harassment or know about it and acquiesce in it). Even if there was sufficient evidence to allow a reasonable fact-finder to determine that other officers harassed Plaintiff as a result of her discrimination complaints, there is not any evidence that Defendant's supervisory or management personnel encouraged, orchestrated, or condoned the harassment in any way.

Plaintiff also contends there was evidence that the finding that she violated the standard operating procedure, and was required to attend retraining, could affect her future promotional opportunities. She cites *Hillig v. Rumsfeld*, 381 F.3d 1028 (10th Cir. 2004), in support of her argument. In *Hillig*, the plaintiff's supervisors had given extremely negative references to a potential employer, so negative that the court found the references carried a significant risk of humiliation, damage to reputation, and a concomitant harm to the plaintiff's future employment opportunities. 381 F.3d at 1035. For that reason, the court found the plaintiff had established more than a *de minimis* harm to any future employment possibilities with the potential employer. Even though the potential employer testified the negative references had no impact on his decision to hire someone else instead of the plaintiff, and the jury found that the plaintiff had not proved she would have been

offered the position in the absence of the negative references, the Tenth Circuit held the negative references could constitute an adverse employment action justifying imposition of liability under Title VII. In doing so, the Tenth Circuit pointed to testimony from the person with hiring authority at the potential employer, to the effect that applicants with negative references would not be hired over applicants without such references. 381 F.3d at 1035.

The *Hillig* Court was careful, however, to point out that the term "adverse employment action" does not encompass every action taken by an employer that may affect the plaintiff's future employment opportunities. 381 F.3d at 1033. The only evidence in this case concerning any possible impact Defendant's action might have on Plaintiff's potential for promotion is Plaintiff's own conclusory statement that the finding on use of force "adversely affected my opportunities for advancement, as noted by my expert in this case..." [Pltf. Mot. for Recon., Exh. A, par. 9] Plaintiff's expert, however, said nothing specific about the retraining requirement or possibilities for advancement through the ranks. Instead, he made only a general reference to the fact that discriminatory treatment of the type Plaintiff suffered "can be stifling to an officer in not only his/her perception of their worth within the agency, but also in actual future job evaluations and assignment/promotion potential." [Resp. to Def. Mot. for Recon., unspecified exh.; Reiter affid. par. 12] Standing in opposition to these general, conclusory, and speculative assertions are the following facts: (1) Plaintiff had several other infractions on her employment record, including some that resulted in letters of reprimand, some that resulted in verbal reprimands, and some that were found to be unfounded; [Pltf. Mot. for Recons., Exh. B] (2) Despite this, Plaintiff had been temporarily promoted to acting sergeant a number of times, with the concurrence of Captain Leeper; [MSJ, Exh. H and Exh. 5 to Exh. H, Affid. of Gilbert Gallegos] (3) Several of these temporary promotions occurred after Plaintiff began complaining about discrimination, and Plaintiff was serving as acting

sergeant at the time she gave notice of her retirement; [*Id.*][3] and (4) Plaintiff has presented no evidence from anyone in a position to make promotion decisions, concerning the effect of disciplinary actions on an Albuquerque police officer's potential for promotion. The Court finds that Plaintiff has failed to raise an issue of fact as to whether the discipline imposed on her had more than a *de minimis* harm, if any, to her future promotion prospects. *See Matthiessen v. Banc One Mortgage Corp.*, 173 F.3d 1242, 1247 (10th Cir. 1999) (expert's conclusory testimony may be rejected and will not preclude summary judgment, if testimony not supported by any facts).       Another new argument made by Plaintiff in her motion for reconsideration is that if she had undergone retraining she might have lost the opportunity to earn overtime pay. This is an attempt by Plaintiff to show concrete monetary harm flowing from the ordered retraining. However, the only evidence Plaintiff offered in support of her assertion is this: a statement in her affidavit indicating that the retraining "apparently" was not to be conducted in the field while she was on patrol, which meant she would lose the opportunity to earn overtime pay on the day or days she was training, because she would not be available to take late calls or to work significant crime scenes such as homicides that would require her to stay beyond her normal shift hours. This evidence is too speculative to raise a genuine issue of fact. First, Plaintiff has only raised the possibility that the retraining would not be conducted while she was on patrol. Second, Plaintiff has only raised the possibility that on the day or days she was

---

[3]The Court notes Plaintiff's assertion that her promotions to acting sergeant, following her complaints, could have been efforts to avoid a discrimination lawsuit. Absolutely no evidence has been presented indicating this is the case, although Plaintiff does cite to a speculative statement made by Plaintiff's expert, to the effect that the temporary promotions would not have been made unless the department had faith in Plaintiff's abilities, "unless they're trying to undercut any kind of discriminatory claim she's making." [Pltf. Resp. to Mot. for Recons., unspecified exh., Reiter dep. p. 91] This statement, based on no evidence at all, raises no issue of fact concerning Defendant's motivations for continuing to temporarily promote Plaintiff.

being retrained,[4] there might be a late call or a significant crime such as a homicide, and she might therefore lose the opportunity to work overtime on that day or those days. Such speculative potential harm cannot constitute an adverse employment action under Title VII.

Plaintiff also vigorously argues that the note from Captain Leeper to Deputy Chief Schultz is strong evidence of discrimination against Plaintiff and Officer Mashburn, the other female officer who was ordered to undergo retraining. While the Court disagrees with this characterization of the note, the Court also finds it irrelevant. For purposes of this motion, the Court has accepted that Plaintiff was the victim of gender discrimination, as there is evidence that male officers who committed violations of other standard operating procedures were not investigated by Internal Affairs or disciplined in any way. The key issue in the case, for purposes of summary judgment, is whether the discipline imposed on Plaintiff is severe enough to constitute an adverse employment action. As discussed in the previous opinion and in this opinion, the Court finds that is not the case. For that reason, Plaintiff's motion for reconsideration will be denied.

**Defendant's Motion for Reconsideration:** In the Court's prior opinion, summary judgment was denied on Plaintiff's First Amendment claim because the only argument Defendant had made against that claim was an argument that Plaintiff did not name an individual as a defendant. Now that the Court has rejected that argument, Defendant wishes to attack the claim on the merits. A First Amendment retaliation claim requires proof of three things: first, the plaintiff was engaged in constitutionally protected activity; second, the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and third, the defendant's adverse action was substantially motivated as a response to the plaintiff's

---

[4]The Court notes there is evidence that Officer Montano, who was ordered to undergo retraining as a result of the same incident involving the bank robber shooting, finished his retraining in 45 minutes to an hour. [MSJ, Exh. F, Montano dep. pp. 8-13] Another portion of the retraining, involving decisional shooting, was incorporated into a shooting range session with Montano's team of officers. [*Id.*]

9

protected conduct. *Mimics, Inc. v. Village of Angel Fire*, 394 F.3d 836, 847 (10th Cir. 2005).[5] For purposes of this motion, Defendant concedes that Plaintiff spoke out on a matter of public concern, and that Plaintiff's interest in speaking out would outweigh Defendant's interest in preventing such speech. Defendant does, however, attack two aspects of Plaintiff's claim. Defendant maintains that the discipline imposed on Plaintiff was so slight as to be not actionable under a First Amendment retaliation claim--in other words, that the discipline was of a type that would not deter a person of ordinary firmness from speaking out. Defendant also claims there was no causal connection between Plaintiff's speech and the requirement that she attend retraining.

In support of the first contention, Defendant argues that this Court has already found the retraining requirement does not constitute an adverse employment action for Title VII purposes, and maintains the same finding is applicable to the First Amendment claim. This argument fails, however, because well-established Tenth Circuit law is to the contrary. Actions that do not rise to the level of an "adverse employment action" under Title VII may still be actionable in a First Amendment retaliation claim. *See, e.g., Baca v. Sklar*, 398 F.3d 1210, 1220 (10th Cir. 2005) ("[W]e have repeatedly concluded that a public employer can violate an employee's First Amendment rights by subjecting an employee to repercussions that would not be actionable under Title VII."). The Court must therefore analyze the question by applying First Amendment law rather than simply importing the Title VII no-adverse-employment-action finding to this claim.

As is true in the Title VII context, the question of whether an employer's actions are significant enough to give rise to a First Amendment claim is analyzed under an objective standard, rather than a subjective one. *Eaton v. Meneley*, 379 F.3d 949, 954 (10th Cir. 2004). That is why the

---

[5]In cases involving a public employee such as Plaintiff, there is an additional factor: that the employee's interest in engaging in the protected activity outweighs the employer's interest in preventing that activity. *David v. City and County of Denver*, 101 F.3d 1344, 1355 (10th Cir. 1996).

standard is framed in terms of whether a person of ordinary firmness would be deterred from speaking out, rather than whether the plaintiff herself was actually deterred from doing so. Furthermore, a trivial or *de minimis* injury will not support a retaliation claim. *See id.*, 379 F.3d at 955.

As the prior opinion discusses, Defendant is liable only for the decisions of a policymaker, and the only policymaker who acted in this case was Chief Gallegos. It is the Chief's actions, therefore, and only the Chief's actions, that may be considered in deciding whether the allegedly retaliatory actions were significant enough to support Plaintiff's retaliation claim. Those actions were as follows: (1) after Plaintiff complained to various media sources and governmental officials, Chief Gallegos allegedly stated that Plaintiff needed to "cool her jets;" (2) after making this comment, Chief Gallegos did nothing concerning the Internal Affairs report, and the recommendations from Leeper and Schultz essentially adopting the report's findings, until Plaintiff submitted her letter of resignation; and (3) one day after Plaintiff submitted her letter of resignation, Chief Gallegos issued a decision exonerating Plaintiff of the charge that shooting at the vehicle's tires was unjustified, but requiring her to attend a training session concerning the use-of-force standard operating procedure. The actions taken by the Chief, therefore, included a verbal reprimand to Plaintiff and a determination that even though the shooting was justified, Plaintiff would have to attend unspecified retraining.

The question before the Court, then, is whether the actions of the Chief, assuming they were in retaliation for Plaintiff's speech, were actions that would deter a "person of ordinary firmness" from continuing to speak out about alleged gender discrimination in the police department. *See Mimics, Inc.*, *supra*. While this standard is easy to state in the abstract, it is not so easy to apply. A review of Tenth Circuit case law is helpful, however. In *Baca v. Sklar*, *supra*, the employer eliminated the plaintiff's supervisory responsibilities over one employee, declined to allow the plaintiff to work with another employee the plaintiff had recruited, encouraged other employees to bypass the plaintiff and obtain supervision from someone else, reprimanded the plaintiff in writing without

11

following the employer's procedures for such action, filed an equal-opportunity-employment charge against the plaintiff alleging he intimidated female staff members, and used that charge as an excuse to demand the plaintiff's resignation. 398 F.3d at 1221. The Tenth Circuit found these actions sufficient to be the basis of the plaintiff's First Amendment retaliation claim.

In another case, *Belcher v. City of McAlester*, 324 F.3d 1203, 1207 n. 4 (10th Cir. 2003), the Tenth Circuit found the following action sufficient: the employer issued a written reprimand specifying that any more violations of the type committed by the plaintiff would result in more severe disciplinary action, up to and including dismissal. The plaintiff had contacted a City Councilor at a time and place not allowed by the employer; the Tenth Circuit stated that the threat of dismissal based on the plaintiff's speech had a real chilling effect on that speech, and therefore constituted an adverse action sufficient to support the plaintiff's First Amendment retaliation claim.

*Schuler v. City of Boulder*, 189 F.3d 1304, 1310 (10th Cir. 1999), is another case in which the employer's actions were found sufficiently adverse in the First Amendment context. In that case, the employer removed important job duties from the plaintiff, gave the plaintiff a written reprimand, gave the plaintiff a low score on her performance evaluation, and involuntarily transferred the plaintiff to another facility, although the plaintiff retained the same title and pay. The Tenth Circuit held this alleged conduct was actionable under the First Amendment.

In contrast to the above cases, the Tenth Circuit determined in *Lybrook v. Members of Farmington Mun. Schs. Bd.*, 232 F.3d 1334, 1339-40 (10th Cir. 2000), that the employer's conduct did not rise to the level of an adverse personnel action sufficient to support a First Amendment retaliation claim. In *Lybrook*, the employer allegedly retaliated against the plaintiff by placing the plaintiff on a Professional Development Plan that required the plaintiff to create an atmosphere that would nurture collaboration with all colleagues, and to conduct her affairs with a conscious concern for the highest standards of professional commitment. In addition, the plaintiff was required to meet

with her principal every Monday morning, and the principal told the plaintiff that four unnamed teachers had complained about the plaintiff. The Tenth Circuit held there are some minor acts by an employer that do not constitute First Amendment violations, and found that to be the case with respect to the actions of the plaintiff's employer. *Id.*

The question for this Court, then, is to determine where the actions of Chief Gallegos lie, on the spectrum from *Lybrook* to *Belcher, Baca,* and *Schuler*. Chief Gallegos expressed irritation about Plaintiff's speech and verbally reprimanded her, by saying she needed to "cool her jets." He also ordered her to attend a training session concerning the use-of-force standard operating procedure, although he found that Plaintiff's act of shooting at the tires with her handgun was justified. The Chief did not, therefore, threaten to fire Plaintiff if she continued to engage in speech, as happened in *Belcher*; he did not demand her resignation, as happened in *Baca*; and he did not transfer her to a different job location, as in *Schuler*. Furthermore, he did not remove any of her job duties or change her job in any way, as occurred in both *Baca* and *Schuler*. Instead, what Chief Gallegos did in this case appears analogous to the employer's actions in *Lybrook*. The Chief's actions in this case essentially told Plaintiff she needed to improve her future job performance by making sure she was aware of the requirements of the use-of-force standard operating procedure; this was the same type of thing the employer in *Lybrook* did, by placing the plaintiff on a development plan that required her to improve her collaboration with other employees as well as her professionalism. Furthermore, the requirement that Plaintiff attend a single training session seems even less onerous than the requirement imposed on the plaintiff in *Lybrook*, that she meet with her supervisor every Monday morning for an apparently indefinite period of time.

Plaintiff argues, again, that the retraining requirement was extremely serious because it involved a crucial aspect of her job. She claims she lost confidence in her ability to know when to use deadly force, and was forced to resign as a result. It would seem training on this subject would

13

likely have enhanced Plaintiff's confidence. Moreover, it must be kept in mind that no one ever told Plaintiff she did not know when to use deadly force in general; the entire Internal Affairs investigation concerned one example of the use of force, using a handgun to shoot at a vehicle's tires on a street crowded with traffic. Furthermore, Plaintiff herself admitted she did not know about the provision in the standard operating procedure prohibiting the use of handguns to shoot at the tires of a vehicle, as that provision was new. [MSJ, Exh. A, Pltf. dep. p. 233; Exh. 1 to Exh. G, Internal Affairs file, findings re: Pltf.] Finally, as noted above the standard to be applied in this case is an objective standard, not a subjective one. *See Eaton v. Meneley*, *supra*, 379 F.3d at 954. The Court determines that finding that an employee has violated a standard operating procedure she admitted she did not know about, and ordering that employee to attend a single training session concerning that regulation, would not deter a person of ordinary firmness from exercising her constitutional rights any more than the employer's actions in *Lybrook* would deter such an exercise of rights. The fact that Plaintiff was extremely upset by the finding, and found it necessary to resign as a result, is a subjective matter that does not affect the proper analysis of the issue. Therefore, the Court finds the actions of Chief Gallegos in this case are not actionable as a First Amendment violation.[6]   **Conclusion:** Based on the foregoing, the Court will deny Plaintiff's motion for reconsideration, grant Defendant's motion for reconsideration, and dismiss this case.

Dated this 15th day of April, 2005.

　

　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　BRUCE D. BLACK
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　United States District Judge

---

[6]Due to this finding, the Court need not address Defendant's argument that there is no causal connection between Plaintiff's speech and the Chief's actions.

**ATTORNEYS**:

**For Plaintiff**:
Robert G. McCorkle
Theresa W. Parrish

**For Defendant**:
Paula I. Forney
Gregory L. Biehler